UNITED STATES *v.* BAGGOT

No. 81–1938.   Argued March 2, 1983—Decided June 30, 1983

*Deputy Solicitor General Wallace* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Archer, Harriet S. Shapiro, Robert E. Lindsay,* and *William A. Whitledge.*

*Samuel J. Betar* argued the cause and filed a brief for respondent.*

JUSTICE BRENNAN delivered the opinion of the Court.

In *United States* v. *Sells Engineering, Inc., ante,* p. 418, we decide today that in some circumstances the Government may obtain disclosure of grand jury materials for civil uses under Federal Rule of Criminal Procedure 6(e)(3)(C)(i) (hereinafter sometimes referred to as (C)(i)). The question in this case is whether an Internal Revenue Service investigation to determine a taxpayer's civil tax liability is "preliminar[y] to or in connection with a judicial proceeding" within the meaning of that Rule. We agree with the Court of Appeals that it is not.

In May 1976, a special grand jury began investigating certain commodity futures transactions on the Chicago Board of Trade. Respondent James E. Baggot became a target of the investigation. He was never indicted; instead, after interviews with IRS agents and plea negotiations with the Government, he pleaded guilty to two misdemeanor counts of violating the Commodity Exchange Act.[1] The substance of Baggot's crime was a scheme to use sham commodities transactions to create paper losses, which he deducted on his tax returns. A fraction of the "losses" was then recovered in cash kickbacks which were not reported as income.

About eight months after Baggot's plea, the Government filed a (C)(i) motion for disclosure of grand jury transcripts and documents to the IRS, for its use in an audit to deter-

---

*Briefs of *amici curiae* urging affirmance were filed by *Erwin N. Griswold* and *Otis M. Smith* for General Motors Corp.; and by *Arlington Ray Robbins* and *Michael E. Cahill* for Fred Witte et al.

[1] 7 U. S. C. § 6c(a)(A).

mine Baggot's civil income tax liability. At first the District Court denied the request. After two renewed motions, however, the court granted disclosure. It held that some of the materials sought are not "matters occurring before the grand jury," and therefore not subject to Rule 6(e)'s requirement of secrecy. With respect to the remainder of the materials, the court concluded that disclosure is not authorized by (C)(i) because the IRS's proposed civil tax investigation is not "preliminar[y] to or in connection with a judicial proceeding." Nevertheless, the court allowed disclosure under its "general supervisory powers over the grand jury." App. to Pet. for Cert. 47a–48a.

The Court of Appeals reversed. *In re Special February, 1975 Grand Jury (Baggot)*, 662 F. 2d 1232 (CA7 1981). It held that all the materials sought, with one possible exception, are "matters occurring before the grand jury" and therefore subject to Rule 6(e). It agreed with the District Court that no disclosure is available under (C)(i), but it held that the District Court erred in granting disclosure under "general supervisory powers." It remanded the case for further consideration concerning the material that might not be "matters occurring before the grand jury." The Government sought certiorari, limited to the question of whether the IRS's civil tax audit is "preliminar[y] to or in connection with a judicial proceeding" under (C)(i). We granted certiorari. 457 U. S. 1131 (1982).

The IRS is charged with responsibility to determine the civil tax liability of taxpayers. To this end, it conducts examinations or audits of taxpayers' returns and affairs. If, after the conclusion of the audit and any internal administrative appeals, the IRS concludes that the taxpayer owes a deficiency, it issues a formal notice of deficiency as prescribed by 26 U. S. C. § 6212 (1976 ed. and Supp. V). Upon receiving a notice of deficiency, the taxpayer has, broadly speaking, four options: (1) he can accept the IRS's ruling and pay the amount of the deficiency; (2) he can petition the Tax

Court for a redetermination of the deficiency; (3) he can pay the amount of the deficiency and, after exhausting an administrative claim, bring suit for a refund in the Claims Court or in district court; or (4) he can do nothing and await steps by the IRS or the Government to collect the tax. See generally 4 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶¶ 111.5, 112.1, 115.1, 115.2, 115.7 (1981).

Certain propositions are common ground between the parties. Both sides, sensibly, understand the term "in connection with," in (C)(i), to refer to a judicial proceeding already pending, while "preliminarily to" refers to one not yet initiated. The Government concedes that an IRS audit, including its informal internal appeal component, is not itself a "judicial proceeding" within the meaning of the Rule. Conversely, Baggot agrees that either a Tax Court petition for redetermination or a suit for refund would be a "judicial proceeding."[2] The issue, then, is whether disclosure for use in an IRS civil audit is "preliminar[y] to" a redetermination proceeding or a refund suit within the meaning of (C)(i).[3] We conclude that it is not.

The provision in (C)(i) that disclosure may be made "preliminarily to or in connection with a judicial proceeding" is, on its face, an affirmative limitation on the availability of court-ordered disclosure of grand jury materials. In our previous cases under Rule 6(e), we have not had occasion to address this requirement in detail, focusing instead on the require-

---

[2] Hence, we need not address in this case the knotty question of what, if any, sorts of proceedings other than garden-variety civil actions or criminal prosecutions might qualify as judicial proceedings under (C)(i). See generally, *e. g., Bradley* v. *Fairfax*, 634 F. 2d 1126, 1129 (CA8 1980); *In re J. Ray McDermott & Co.*, 622 F. 2d 166, 170–171 (CA5 1980); *In re Special February 1971 Grand Jury* v. *Conlisk*, 490 F. 2d 894, 897 (CA7 1973); *Doe* v. *Rosenberry*, 255 F. 2d 118, 120 (CA2 1958).

[3] Our decision is limited to the meaning of (C)(i). Other considerations may govern the construction of similar standards in other contexts (*e. g.,* Fed. Rule Civ. Proc. 26(b)(3) ("in anticipation of litigation or for trial")).

ment that the moving party show particularized need for access to grand jury materials. See *Sells, ante,* at 442–446, and cases cited. The two requirements, though related in some ways,[4] are independent prerequisites to (C)(i) disclosure. The particularized-need test is a criterion of *degree;* the "judicial proceeding" language of (C)(i) imposes an additional criterion governing the *kind* of need that must be shown. It reflects a judgment that not every beneficial purpose, or even every valid governmental purpose, is an appropriate reason for breaching grand jury secrecy. Rather, the Rule contemplates only uses related fairly directly to some identifiable litigation, pending or anticipated. Thus, it is not enough to show that some litigation may emerge from the matter in which the material is to be used, or even that litigation is factually likely to emerge. The focus is on the *actual use* to be made of the material. If the primary purpose of disclosure is not to assist in preparation or conduct of a judicial proceeding, disclosure under (C)(i) is not permitted. See *United States* v. *Young,* 494 F. Supp. 57, 60–61 (ED Tex. 1980).

It follows that disclosure is not appropriate for use in an IRS audit of civil tax liability, because the purpose of the audit is not to prepare for or conduct litigation, but to assess the amount of tax liability through administrative channels.[5]

---

[4] The particularized-need test requires that the materials sought be "needed to avoid a possible injustice in another judicial proceeding" and that the moving party's request be "structured to cover only material so needed." *Douglas Oil Co.* v. *Petrol Stops Northwest,* 441 U. S. 211, 222 (1979) (footnote omitted). See generally *id.,* at 221–224; *United States* v. *Sells Engineering, Inc., ante,* at 442–446. These inquiries cannot even be made without consideration of the particulars of the judicial proceeding with respect to which disclosure is sought. See also the proposed new Rule 6(e)(3)(E), to take effect August 1, 1983.

[5] The Government relies on a remark by Wayne LaFave (Reporter for the Advisory Committee on Rules) during congressional hearings leading to the 1977 amendment to Rule 6(e). See generally *United States* v. *Sells Engineering, Inc., ante,* at 436–442. In response to a question, LaFave

Assuming, *arguendo*, that this audit will inevitably disclose a deficiency on Baggot's part, see also n. 6, *infra*, there is no particular reason why that must lead to litigation, at least from the IRS's point of view. The IRS's decision is largely self-executing, in the sense that it has independent legal force of its own, without requiring prior validation or enforcement by a court. The IRS need never go into court to assess and collect the amount owed; it is empowered to collect the tax by nonjudicial means (such as levy on property or salary, 26 U. S. C. §§ 6331, 6332), without having to prove to a court the validity of the underlying tax liability. Of course, the matter may end up in court if Baggot chooses to take it there, but that possibility does not negate the fact that the primary use to which the IRS proposes to put the materials it seeks is an extrajudicial one—the assessment of a tax deficiency by the IRS. The Government takes countless actions that affected citizens are permitted to resist or challenge in court. The fact that judicial redress may be sought, without more, does not mean that the Government's action is "preliminar[y] to a judicial proceeding." Of course, it may often be loosely said that the Government is "preparing for

---

agreed that a "tax hearing" would be considered a judicial proceeding for purposes of Rule 6(e). Hearings on Proposed Amendments to the Federal Rules of Criminal Procedure before the Subcommittee on Criminal Justice of the House Committee on the Judiciary, 95th Cong., 1st Sess., 94 (1977). LaFave's somewhat ambiguous reference to a "tax hearing," however, cannot reasonably be taken to refer to an administrative audit. As LaFave explained earlier:

"[T]he cases say that the grand jury material cannot be turned over to an administrative agency for purely administrative proceedings, because that is not a judicial proceeding. But there are occasions when an administrative agency can show sufficient need with respect to pending judicial proceedings." *Id.*, at 86.

Indeed, if LaFave's remark meant what the Government now takes it to mean, LaFave's position would be inconsistent with the Government's own position, which is that the audit is not *itself* a judicial proceeding but only *preliminary to* one.

litigation," in the sense that frequently it will be wise for an agency to anticipate the chance that it may be called upon to defend its actions in court. That, however, is not alone enough to bring an administrative action within (C)(i). Where an agency's action does not require resort to litigation to accomplish the agency's present goal, the action is not preliminary to a judicial proceeding for purposes of (C)(i).

We need not decide whether an agency's action would always be preliminary to litigation if it arose under an administrative scheme that does require resort to courts—one in which, for example, the agency, when it found a probable violation of law, was required to bring a civil suit or criminal prosecution to vindicate the law and obtain compliance.[6] We also do not hold that the Government (or, for that matter,

---

[6] In particular, we find it unnecessary to address the complex contentions of the parties as to the level of likelihood of litigation that must exist before an administrative action is preliminary to litigation. Baggot points out that the purpose of an audit is to determine whether *or not* he owes any tax deficiency. Thus, he argues, the occurrence of litigation is contingent not only on his decision to contest an assessment, see n. 7, *infra*, but on the outcome of the audit itself. He concludes that administrative investigations of this kind can never qualify as "preliminar[y] to a judicial proceeding," since to posit a judicial proceeding is to prejudge the very question supposedly being decided in the investigation. See, *e. g., United States* v. *Bates*, 200 U. S. App. D. C. 296, 627 F. 2d 349 (1980); *McDermott*, 622 F. 2d, at 171; *In re Grand Jury Proceedings*, 309 F. 2d 440, 443–444 (CA3 1962). The Government counters that when the taxpayer has already pleaded guilty to a tax scam, the prospect of exoneration from civil liability is more theoretical than real. See, *e. g., In re Judge Elmo B. Hunter's Special Grand Jury Empaneled September 28, 1978*, 667 F. 2d 724 (CA8 1981); see also *Doe* v. *Rosenberry*, 255 F. 2d, at 119–120. As a general matter, many an investigation, begun to determine *whether* there has been a violation of law, reaches a tentative affirmative conclusion on that question; at that point, the focus of the investigation commonly shifts to ascertaining the scope and details of the violation and building a case in support of any necessary enforcement action. We decline in this case to address how firm the agency's decision to litigate must be before its investigation can be characterized as "preliminar[y] to a judicial proceeding," or whether it can ever be so regarded before the conclusion of a formal preliminary administrative investigation.

a private party who anticipates a suit or prosecution against him) may never obtain (C)(i) disclosure of grand jury materials any time the initiative for litigating lies elsewhere.[7]   Nor do we hold that such a party must always await the actual commencement of litigation before obtaining disclosure.   In *In re Grand Jury Proceedings, Miller Brewing Co.*, 687 F. 2d 1079 (CA7 1982), rehearing pending, for example, the IRS had closed its audit and issued a notice of deficiency, and the taxpayer had clearly expressed its intention to seek redetermination of the deficiency in the Tax Court.   The same court that denied disclosure in this case correctly held in *Miller Brewing* that the IRS may seek (C)(i) disclosure.   In such a case, the Government's primary purpose is plainly to use the materials sought to defend the Tax Court litigation, rather than to conduct the administrative inquiry that preceded it. There may be other situations in which disclosure is proper; we need not canvass the possibilities here.   In this case, however, it is clear that the IRS's proposed use of the materials is to perform the nonlitigative function of assessing taxes rather than to prepare for or to conduct litigation.   Hence, no disclosure is available under (C)(i).

The judgment of the Court of Appeals is

*Affirmed.*

CHIEF JUSTICE BURGER, dissenting.

The Court today holds that administrative agencies may not inspect grand jury materials unless the "primary purpose

---

[7] We reject Baggot's argument that litigation is a remote contingency because, if a deficiency is assessed against him, he may simply choose to pay it, or to negotiate some settlement with the Government.   The Government correctly points out that settlement (including settlement by surrender) is almost always a possibility.   If some chance of settlement were enough to disqualify a case from eligibility for (C)(i) disclosure, there would be nothing left of the "preliminarily to" language of the Rule.   There may conceivably be instances in which the chances of litigation are so low that it cannot be considered a realistic possibility, but this case at least is not such an instance.

of disclosure" is "to assist in preparation or conduct of a judicial proceeding . . . ." *Ante*, at 480. This holding is not compelled by either the language or history of Rule 6(e), and it ignores the vital public interest in effective law enforcement in noncriminal cases. I therefore dissent.

Rule 6(e)(3)(C)(i) of the Federal Rules of Criminal Procedure provides that a district court may in its discretion order disclosure of grand jury materials *"preliminarily to or in connection with a judicial proceeding."* (Emphasis added.) It is evident from the language of the Rule that disclosure prior to the actual filing of a complaint was contemplated by the Congress. Disclosure *"in connection with a judicial proceeding"* encompasses those situations where a suit is pending or about to be filed. The words *"preliminarily to"* necessarily refer to judicial proceedings not yet in existence, where, for example, a claim is under study. The Court's interpretation of this language effectively reads the words "preliminarily to" out of the Rule. The Court interprets the Rule to apply only to cases where the "actual use" of the materials sought is to prepare for or conduct litigation. *Ante*, at 480. If this were indeed Congress' intent, then it would have sufficed to allow disclosure "in connection with judicial proceedings" without the added words permitting disclosure "preliminarily to" judicial proceedings. As the Court now interprets the Rule, disclosure prior to the filing of a complaint will only rarely be permitted.

It is unclear from the legislative history exactly what Congress intended the phrase "preliminarily to or in connection with a judicial proceeding" to mean with respect to disclosure to administrative agencies. That phrase has been unchanged since the original Rule 6 was adopted in 1946. The 1946 Advisory Committee Notes explained that the Rules codified the traditional doctrine of grand jury secrecy. 18 U. S. C. App., p. 1411. The two cases cited by the 1946 Notes as examples of the traditional practice involved mo-

tions for disclosure—which were denied—in connection with an existing judicial proceeding, and not in connection with an administrative investigation or hearing. *Schmidt* v. *United States*, 115 F. 2d 394 (CA6 1940); *United States* v. *American Medical Assn.*, 26 F. Supp. 429 (DC 1939). In short, it does not appear that Congress in 1946 intended by these words "to resolve the tension between administrative agencies' need for information and grand juries' need for secrecy." See Note, Facilitating Administrative Agency Access to Grand Jury Material, 91 Yale L. J. 1614, 1620–1625 (1982).

The legislative history to the 1977 amendments to Rule 6(e) offers somewhat more guidance to Congress' intent with respect to disclosure to administrative agencies. Those amendments carried over unchanged the "preliminarily to or in connection with" language of the 1946 Rule. The amendments were primarily concerned with spelling out to whom and under what conditions Government attorneys in the Department of Justice could disclose grand jury materials to other Government personnel who were assisting in the criminal investigation. The Senate Report on the amendments stated that the amendments were intended to balance the need for prosecutors to have the assistance of other Government personnel against the fear that such indirect agency access "will lead to misuse of the grand jury to enforce non-criminal Federal laws . . . ." S. Rep. No. 95–354, p. 8 (1977). However, the Report specifically stated that in balancing these interests:

> "[T]here is . . . no intent to preclude the use of grand jury-developed evidence for civil law enforcement purposes. On the contrary, *there is no reason why such use is improper*, assuming that the grand jury was utilized for the legitimate purpose of a criminal investigation. . . ." *Ibid.* (emphasis added).

This language plainly states the two conflicting policies with which Congress was concerned: to promote effective enforce-

ment of civil claims by allowing agencies access to grand jury material for civil purposes, and to prevent the abuse of the grand jury as a tool for civil discovery.

The Senate Report concluded that "the Committee believes and intends that the basis for a court's refusal to issue an order under paragraph (C) to enable the government to disclose grand jury information in a non-criminal proceeding should be no more restrictive than is the case today under prevailing court decisions." *Ibid.* (footnote omitted). This reference to Rule 6(e)(3)(C) suggests that Congress understood that the conflicting policies of the Rule would be balanced by the district courts in weighing a motion for disclosure under the "preliminarily to or in connection with judicial proceedings" provision.

One of the two cases cited by the Senate Report as evidence of "prevailing court decisions" was *Robert Hawthorne, Inc.* v. *Director of Internal Revenue,* 406 F. Supp. 1098, 1126 (ED Pa. 1976). In *Robert Hawthorne,* Internal Revenue Service agents assisted federal prosecutors investigating possible criminal tax violations via a grand jury. The District Court held that this assistance was proper, and also held that upon termination of the grand jury investigation, the IRS's "future use of the materials to which it had access will follow as though there had been no access." *Id.,* at 1129. In such a case, the IRS could petition "for disclosure under the second sentence of Rule 6(e) permitting disclosure upon order of court preliminary to or in connection with a judicial proceeding." *Id.,* at 1129, n. 62. The *Robert Hawthorne* court assumed that a motion for disclosure would be proper; it did not suggest that such a motion would be premature if the agency was not yet preparing for or conducting litigation.

The House debates on the 1977 amendments also suggest that Congress understood the Rule to permit disclosure to agencies prior to the onset of litigation. Representative Charles Wiggins stated that although a Government agent

assisting the prosecutor is "not free to share [grand jury] information within the agency which directly employs him," once a violation of civil laws is uncovered, the agency could seek disclosure pursuant to a court order:

> "There will come a time when a grand jury uncovers violations of civil laws, or State or local laws. It then becomes the duty of the attorney for the Government, if he or some other attorney for the Government cannot act on that information, *to turn it over to the appropriate governmental agency so that such agency can do its duty.* However, the attorney for the Government may do this only after successfully seeking an order of the court." 123 Cong. Rec. 25196 (1977) (emphasis added).

Representative Wiggins did not say that disclosure would be improper if the agency were not already planning litigation. Rather, the thrust of his remarks is that disclosure would be proper to enable an agency to determine *whether* to conduct an investigation or bring a civil complaint. Of course, to seek successfully an order from the court, the agency would have to show that its need for the materials outweighed the interest in grand jury secrecy. *Illinois* v. *Abbott & Associates*, 460 U. S. 557, 567–568, n. 15 (1983); *Douglas Oil Co.* v. *Petrol Stops Northwest*, 441 U. S. 211 (1979); *United States* v. *Procter & Gamble Co.*, 356 U. S. 677 (1958).

In reviewing the legislative history, it is apparent, as is often the case, that Congress did not focus directly on the precise issue presented here. Rather, the legislative history primarily "reflects a concern . . . with the policies underlying the rule—the prevention of grand jury abuse and the facilitation of civil law enforcement." Note, Federal Agency Access to Grand Jury Transcripts under Rule 6(e), 80 Mich. L. Rev. 1665, 1674–1675 (1982). Given the absence of clear statutory language or statements of legislative intent, I would be guided by the policies with which the Congress was concerned.

In focusing on the "actual use" of the grand jury materials, the Court attempts in a crude and rigid way to reconcile the conflicting policies at issue. I believe a better balance is struck by holding that the threshold test for disclosure under Rule 6(e)(3)(C)(i) is satisfied so long as there is a possibility that the agency's action, should it ultimately act, would be subject to judicial review. In this respect, it makes no difference whether the judicial review would be *de novo*, as here, or more limited; nor does it matter that the party adversely affected by agency action might choose to forgo judicial review. This kind of broad interpretation of the language "preliminarily to . . . a judicial proceeding" clearly enlarges the potential for aiding civil law enforcement. If this standard is met—as it often would be—the questions for the court would be whether the prosecutor has shown that the grand jury has not been used primarily for civil discovery purposes, and whether the agency's need for the materials outweighs the need for grand jury secrecy. This approach focuses attention on the key policies with which Congress was concerned in 1946 and again in 1977, and permits the courts to reconcile the competing interests on a case-by-case basis. See *id.*, at 1680–1689. The result will be to enhance civil law enforcement interests while reducing the risk of abuse.

The Court is proceeding on an assumption that Government agencies, with the assistance of prosecutors, will subvert the grand jury into a tool of civil discovery whenever possible. Accordingly, the Court erects a rigid barrier restricting agency access on the theory that this will remove the incentive for abuse. The fundamental flaw in this analysis is the idea that abuse of the grand jury is a common phenomenon, which, of course, it is not. Few cases of grand jury abuse have ever been reported, and even fewer since this Court made clear in *United States* v. *Procter & Gamble Co.*, *supra*, at 683, that the Government's use of "criminal procedures to elicit evidence in a civil case . . . would be flout-

ing the policy of the law." Moreover, the tremendous pressure on Government prosecutors to investigate the federal crimes in their jurisdictions—crimes which today are both more numerous and complex than ever before—reduces the likelihood that prosecutors will be swayed from their primary tasks or violate professional ethical standards at the behest of agency personnel. Finally, there is no reason to think that the courts are incapable of policing such occasional abuses as might occur. On the contrary, the reported cases show the sensitivity of the courts to the risks of grand jury abuse, and their readiness to act to ensure the integrity of the grand jury. See, *e. g.*, *In re April 1956 Term Grand Jury*, 239 F. 2d 263 (CA7 1956); *United States* v. *Doe*, 341 F. Supp. 1350 (SDNY 1972); *Cohen* v. *Commissioner*, 42 TCM 312, 321 (1981).

In its battle against a largely phantom, "strawman" threat, the Court fails to account for the substantial costs its rule will impose on the public. In investigating complex financial crimes, federal prosecutors often seek assistance from such agencies as the Securities and Exchange Commission and the IRS. Agency personnel may devote countless thousands of lawyer hours assisting in the investigation of a criminal case. See, *e. g.*, Brief for United States in *United States* v. *Sells Engineering, Inc.*, O. T. 1982, No. 81–1032, p. 39, n. 37. To force the agencies to duplicate these investigations is not only a waste of resources; the result may be that some meritorious administrative actions will never be brought. See *United States* v. *Sells Engineering, Inc., ante,* at 470, and n. 13 (BURGER, C. J., dissenting). I cannot believe that Congress intended or would approve such a result.

Applying these principles, I would reverse and remand. The IRS sought release of the grand jury information to determine whether to audit respondent. There was clearly a possibility that the IRS would take action that would be subject to judicial review. Indeed, on these facts it was almost certain that the IRS would assert a deficiency against re-

spondent, who could then choose to pay it or contest it in court. Accordingly, I would hold that the disclosure was sought "preliminarily to" a judicial proceeding within the meaning of Rule 6(e)(3)(C)(i), and remand for determination whether the Government had shown sufficient need for the materials and that it had conducted the grand jury investigation in good faith.